IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ANNIKA H. & PRAXTON H.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ANNIKA H. AND PRAXTON H., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHRISTOPHER O., APPELLANT.


Filed July 18, 2017.    Nos. A-16-1077, A-16-1078.


Appeal from the County Court for Adams County: MICHAEL P. BURNS, Judge. Affirmed.

Jessica J. Bauer, of Seiler & Parker, P.C., L.L.O., for appellant.

Cassie L. Baldwin, Deputy Adams County Attorney, for appellee.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

The county court for Adams County, sitting as a juvenile court, terminated Christopher O.'s parental rights to his daughter, Annika H. (case No. A-16-1077), and to his son, Praxton H. (case No. A-16-1078). The two cases have been consolidated on appeal for briefing and disposition. Christopher argues that the juvenile court erred in terminating his parental rights and in finding that such termination was in the children's best interests. For the following reasons, we affirm.

BACKGROUND

*Procedural Background.*

Christopher and Cassandra H. are the biological parents of twins, Annika and Praxton, born in December 2013. Christopher has been incarcerated since before the children's birth, and at the

- 1 -

time of the juvenile court proceedings, was at the Tecumseh State Correctional Institution (TSCI). The State terminated Cassandra's parental rights to the children in these same proceedings. Because Cassandra is not part of this appeal, she will only be discussed as necessary.

Annika and Praxton were removed from Cassandra's care and custody on July 21, 2014. The basis of the removal was neglect and Cassandra's methamphetamine addiction. Annika and Praxton were placed in the custody of the Nebraska Department of Health and Human Services (DHHS), and into foster care where they have remained. The children were adjudicated to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014) in September 2014.

Another man was initially identified as the children's father. But Christopher was determined to be the biological father of the children after genetic testing results were obtained in March 2015.

On March 4, 2016, the State filed separate "supplemental petition[s]" seeking to terminate Christopher's parental rights to Annika and Praxton pursuant to Neb. Rev. Stat. § 43-292(1), (2), (3), and (7) (Reissue 2016). The State alleged that: Christopher had abandoned the children for six months or more immediately prior to the filing of the petition; Christopher substantially and continuously or repeatedly neglected and refused to give the children, or a sibling, necessary care and protection; Christopher, being financially able, had willfully neglected to provide the juveniles with the necessary subsistence, education, or other care necessary for their health, morals, or welfare or had neglected to pay for such subsistence, education, or other care when legal custody of the juveniles was lodged with others and such payment ordered by the court; the children had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination was in the children's best interests.

*Termination Hearing*.

The hearing on the supplemental petitions for termination of Christopher's parental rights to Annika and Praxton was held August 18, 2016. Christopher appeared by telephone, and was represented by counsel who was present at the hearing. A lot of the testimony presented at the hearing related solely to Cassandra and her progress in the case, which is not relevant to this appeal. We limit our summary of the testimony and evidence to that which is relevant to Christopher.

Kara Allee was the DHHS case worker assigned to Annika's and Praxton's cases from February to November 2015. Allee testified that Christopher's paternity was established during her time on the case; she first notified him about the children via letter and later visited him at TSCI in April 2015. Christopher asked to see his children, for information regarding the children, and for pictures of them. Christopher also requested that his family be considered as a placement option for the children; a home study was completed but placement was denied. (A case plan received into evidence states that a home study was done on Christopher's father and stepmother, but DHHS found "the home is currently unsuitable due to not enough space as there are other family members currently living in the home.") After Allee's April visit with Christopher at TSCI, there was a riot "which made it impossible for [her] to telephone him or for him to phone [her]." She said she continued to send letters to Christopher, but did not elaborate as to the content of the letters. During Allee's time on the case, Christopher did not have visits with the children, nor did he provide them with gifts. Allee opined that it would be in the children's best interests to terminate

Christopher's parental rights. Her opinion was "solely based on the fact that he is in prison and unable to take care of the children."

LeAnn Tech has been the DHHS child and family services specialist assigned to Annika's and Praxton's cases since November 2015. She testified that the children were removed from the home on July 21, 2014, "due to abandonment by Cassandra H[.] due to her addiction to methamphetamines," and they have remained in an out-of-home placement ever since. During Tech's time on the case, Christopher had not had visits with the children; he never personally requested visits, nor had he requested phone contact with the children. Christopher did inquire about their wellbeing, and each month Tech sent a letter to Christopher updating him on the case and how the children were doing. Tech also visited Christopher once at TSCI in May 2016.

Tech testified that Annika and Praxton are doing well and they are bonding with their foster family. Annika gets services twice a month for her speech, and "in association," Praxton gets those same services. Tech opined that it would be in the children's best interests to terminate Christopher's parental rights "[d]ue to the fact that they have been in foster care for nearly 25 months and the lack of progress on the case plan." On cross-examination Tech was asked if Christopher was included in the case plan. Tech responded, "He was acknowledged in the progress, but he was not assigned specific goals."

The children's foster mother testified that they came to live with her in March 2015, when they were 15 months old. At that time, Annika would not speak or even mumble. "There was no communication with her whatsoever. And when she would look at you, she would have a very blank look to her face." She also cried a lot. Praxton was very aggressive; "[h]e would draw blood on myself and our two other children pretty much daily by his fingernails rubbing -- usually in my face, like . . . just dragging his hands." "[I]t didn't seem intentional, just that he had a lot of emotions and . . . we took it as he didn't quite know what to do with it all." The foster mother said that Annika's speech has improved, as has both children's behaviors.

Joan Schwan is a licensed independent mental health practitioner whose specialty focuses on "children, trauma, attachment, abuse, neglect, separation and loss." She was contacted by DHHS to do a bonding and attachment study at the recommendation of Dr. John Meidlinger. (She clarified on cross-examination that the bonding assessment was of the children with the foster family.) DHHS was looking for what kind of special needs the children would have moving into permanency, and if they had bonding and attachment difficulties, so that was the focus of Schwan's recommendations. According to Schwan, she: gathered collateral information, like Dr. Meidlinger's reports; talked to the caseworker to find out the background of the case; contacted the foster parents to get background information from them; and met the children and the foster parents once in the office (March 28, 2016), and once in the home (April 8, 2016). The March office visit was the first time that Schwan met Annika and Praxton. She never had contact with Christopher. Schwan's bonding and attachment assessment report, dated May 3, was received into evidence without objection.

Schwan diagnosed the children with "adjustment disorder, anxiety" and said permanency is "critically important" for them. The children had bonding and attachment concerns and Schwan recommended they remain in their current foster placement. When asked what the basis was for her recommendation, Schwan said:

The children, when they were first placed with this foster home, had suffered a number of moves already by the time they were 15 months old, inadequate care. They were demonstrating significant signs of attachment trauma when they were first placed with this family. However, since December of 2015 [when visits with Cassandra stopped], they've made great strides. I believe that to move them or to separate a bond that was just starting to form would be devastating for them, something for which they might not necessarily ever recover.

According to Schwan, interrupting the children's placement would have "tremendous consequences" and "[t]hey would more than likely regress, they might lose their speech." She said "these were two very compromised children that basically, when they were placed [with the foster family], met the diagnosis for Reactive Attachment Disorder but the disorganized type . . . they're not really attached to anybody," and "if left untreated, research shows it leads to psychopathology later on in life." The only reason Schwan did not diagnose the children with Reactive Attachment Disorder is because they were beginning to show signs of a relationship with their foster parents.

In her report, Schwan recommended that no visitation with either parent be granted at this time. When asked the basis for her recommendation, Schwan said "it would disrupt their attachment." She gave many reasons related to Cassandra. With regard to Christopher, Schwan stated that "they had never met their father" and he "would be a complete stranger to them." When asked what her recommendation would be as to where to begin the visitation process with Christopher, Schwan said:

[M]any kids later on in life want to meet who their biological parents are, and that's very normal. But you would want to at least let these children be at a place where they could express verbally how they feel about things. Otherwise, if they're taken someplace and left with a person they don't know, a stranger, it's very scary, and you impact more pre-verbal trauma.

According to Schwan, it would be a number of years before she would feel comfortable recommending visits occur with Christopher. "[V]isits probably shouldn't begin at all until maybe the kids are seven, eight, nine, if at some point they're okay. But right now, these kids don't have the facilities or the verbal language to even process who this person would be and why they're being left with this person." If the ultimate goal were to work towards reunification with Christopher, it would be a lengthy process, and "probably not" in the children's best interests.

Cassandra testified that, to her knowledge, Christopher did not know she was pregnant, and she never personally informed him he was the father of the twins.

Christopher testified that he received a letter from DHHS in January 2015 notifying him that he might be the father of Annika and Praxton and that he needed to take a paternity test. The test was done in February and he got the results in March. Christopher has never had contact with the children, but said he requested to see the children twice when Allee was their caseworker and "[e]very time we've had court [four or five times], I've asked the judge that I be allowed visitation, and I've been denied." He also asked to speak with the children on the phone (this was apparently denied), and asked for pictures of the children. Christopher sent his attorney two cards and two

letters for the twins, but does not know if they got forwarded. He has never sent gifts to the children because "I can't purchase them . . . where I'm at [prison]." He is current on his child support obligation of $10 per month. Christopher said that when his child support was set, "I told them they could set it for more than $10, but the mediator said he didn't feel comfortable setting it for anything over $10 since I was incarcerated."

Christopher had been convicted of terroristic threats, second degree assault, and possession of a deadly weapon (firearm); the context and details of those crimes do not appear in our record. The crimes (at least the terroristic threats and the assault) occurred in July or August 2012, before the time the twins were conceived. His aggregate sentence does not appear in our record; our record only contains the December 2013 order sentencing Christopher to 4 to 5 years' imprisonment for the possession of a deadly weapon charge. At the time of the termination hearing, Christopher had been incarcerated at TSCI for "[a] little over three years." He went before the parole board in July 2016 (the month before the termination hearing) "when I became eligible [for parole], and they deferred me for six months just so I had a chance to finish my program." He said he needed to finish a violence reduction program and is "on the list" to start that program; he is "waiting to be transferred to NSP at this moment to start that class." He testified that he will go before the Parole Board again in February 2017. His "jam date" is in October 2024, but "what my Parole Board said, as soon as I complete [the violence reduction program], I'll been [sic] released -- work released on parole."

At TSCI, Christopher completed two programs: "InsideOut Dads" and "Dads on the Outside." Both were 6-week programs for incarcerated fathers to "get parental skills and everything else." At the recommendation of Allee, he was also involved in "Toastmasters." He has been informed that there are no more programs at TSCI for him at this time.

*Juvenile Court's Decision.*

In separate orders filed on October 24, 2016, the juvenile court terminated Christopher's parental rights to Annika and Praxton pursuant to § 43-292(1) and (7), and found that termination was in the children's best interests. Christopher has timely appealed the juvenile court's orders.

## ASSIGNMENTS OF ERROR

Christopher assigns, consolidated and restated, that the juvenile court erred in finding grounds exist to terminate his parental rights under § 43-292(1) and in finding that such termination was in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Christopher's parental rights to Annika and Praxton, the juvenile court found that Christopher abandoned the children for six months or more immediately preceding the filing of the supplemental petition (§ 43-292(1)); and the children had been in an out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Christopher does not appeal the statutory grounds under § 43-292(7). Annika and Praxton have been in an out-of-home placement continuously since July 21, 2014. At the time the supplemental motion to terminate parental rights was filed on March 4, 2016, they had been in an out-of-home placement for 19 months. At the time of the termination hearing on August 18, Annika and Praxton had been in an out-of-home placement for nearly 25 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Christopher's parental rights under § 43-292(7) were proven by sufficient evidence.

Accordingly, we need not consider whether termination of Christopher's parental rights was proper pursuant to § 43-292(1) as assigned by Christopher, since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S.*, *supra*. Thus, the next inquiry is whether termination is in the children's best interests.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Annika and Praxton were born in December 2013 and Christopher testified that he has never had contact with the children. In fact, he has been incarcerated since before they were born. Cassandra testified that, to her knowledge, Christopher did not know she was pregnant, and she never personally informed him he was the father of the twins. Christopher testified that he received a letter from DHHS in January 2015 notifying him that he might be the father of Annika and Praxton and that he needed to take a paternity test. The test was done in February and he received the results in March.

Allee testified that when she visited Christopher at TSCI in April 2015, he asked to see the children, for information regarding the children, and for pictures of them. Tech testified that Christopher inquired about the children's wellbeing. Christopher testified that he took advantage of all programs available to him at TSCI, including two parenting programs. He volunteered to have his child support set at a higher amount, but the mediator would not set a higher amount since Christopher was incarcerated. And "every time we've had court," which was four or five times, Christopher asked the judge to allow visits, but his request was denied. This testimony was corroborated on the record when at the end of the termination hearing, the State asked the court to take judicial notice of the case files to show that Christopher never filed any motions for visitation. The court said it would note that no filing had been made, but said, "I've been the judge who has presided when he's made requests for contact or visits between himself and the children that I've denied." The court went on to say that the fact that Christopher did not file a written motion for visitation would not have any significant bearing on the decision. There was no explanation given in the record for why Christopher's requests for visits were denied.

It appears that once Christopher found out that he was a father, or potential father, he did as much as he could given his incarceration. The juvenile court also acknowledged how quickly Christopher became involved in the cases. We are not sure what more he could have done. Yet, his incarceration is an impediment to his ability to parent.

Schwan testified that permanency is "critically important" for the children. If the ultimate goal were to work towards reunification with Christopher, Schwan said it would be a lengthy process, and "probably not" in the children's best interests. She even said it would be a number of years before she would feel comfortable recommending visits occur with Christopher because Annika and Praxton "had never met their father" and he "would be a complete stranger to them." "[V]isits probably shouldn't begin at all until maybe the kids are seven, eight, nine, if at some point they're okay. But right now, these kids don't have the facilities or the verbal language to even process who this person would be and why they're being left with this person."

We find Schwan's testimony regarding visitation puzzling. Although we recognize that Christopher has never met Annika and Praxton and would be a stranger to them, we fail to see why visits should not begin until they are older and have the "verbal language to even process who this person is." Children constantly meet new people (e.g. teachers, daycare providers, medical providers, neighbors, et cetera), and while those people start out as strangers to the children, they ultimately become familiar faces. Without further reasoning beyond "he's a stranger," we discount Schwan's testimony that the children need to be older before they even meet Christopher. As to reunification, Schwan did not elaborate on her reasoning. We can only surmise based on her overall testimony and her report, that it is because the children would need to become familiar with

Christopher and because any change of placement would "disrupt their attachment" to the foster parents with whom they had bonded.

Allee testified that it would be in the children's best interests to terminate Christopher's parental rights "solely based on the fact that he is in prison and unable to take care of the children." And Tech testified that it would be in the children's best interests to terminate Christopher's parental rights "[d]ue to the fact that they have been in foster care for nearly 25 months and the lack of progress on the case plan." However, on cross-examination she said that Christopher was acknowledged in the case plan, but was not assigned specific goals. Thus, Allee's and Tech's opinions regarding best interests come down to Christopher's incarceration and the length of time the children have been in an out-of-home placement.

Incarceration alone cannot be the sole basis for terminating parental rights, but it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). See, also, Neb. Rev. Stat. § 43-292.02(2) (Reissue 2016) (stating in relevant part that the State shall not file a petition to terminate parental rights if the sole factual basis for the petition is that the parent is incarcerated). Although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *In re Interest of Jahon S., supra.* Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id.* See, also, *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

The State points out that Christopher's own actions led to his incarceration. While that is true, as Christopher notes, this case "is somewhat unique in Nebraska case law in that the act that lead to his conviction and subsequent incarceration occurred approximately one and a half years prior to the birth of Annika and Praxton." Brief for appellant at 5. In other words, his criminal acts occurred before the twins were even conceived; based on the record before us, we presume that that the twins were conceived while Christopher was out on bail. That fact makes this case distinguishable from other incarceration cases that have come before our appellate courts. See, e.g., *In re Interest of Gabriella H.*, 289 Neb. 323, 855 N.W.2d 368 (2014) (incarceration while awaiting trial did not insulate father from having parental rights terminated when he knew he was potentially father of child and abandoned child after initially being involved in her life); *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002) (termination of father's parental rights in best interests of children despite father's testimony he was scheduled for parole 3 months after termination hearing; he had knowingly and deliberately violated probation and knew mother was pregnant again with his child; deliberate probation violation placed him in position where he was unable to parent children and could not provide for their needs; he never cared for children prior to incarceration and they had been in foster care for 2 and 4 years); *In re Interest of Azia B.*, 10 Neb. App. 124, 626 N.W.2d 602 (2001) (termination of parental rights under § 43-292(2) when father had been incarcerated essentially child's entire life for violent behaviors, including assault on child's mother when child was one year old; no showing that father will be in position to parent even when released).

Under the circumstances of this case, the voluntary nature of Christopher's crimes should not be counted against him because at the time the crimes were committed he was not a father, or

even an expecting father. Thus, at the time, he was not knowingly placing himself in a position where he was unable to parent the children and could not provide for their needs.

This case truly comes down to the amount of time the children have been in an out-of-home placement and the unknown timing of Christopher's future release from incarceration. But "[r]egardless of the length of time a child is placed outside the home, it is always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody." *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 1006, 767 N.W.2d 74, 92 (2009). See, also, *In re Interest of Athina M.*, 21 Neb. App. 624, 842 N.W.2d 159 (2014). In cases that address best interests based on the length of time the child has been in an out-of-home placement, other factors, such as the parent's lack of involvement or inability to make progress, are also present *Id*.

In *In re Interest of Athina M., supra*, this court found that termination of a father's parental rights was not in the child's best interests and we reversed the termination. The State's only reasons for wanting to terminate the father's rights were that he was incarcerated at the time of the termination hearing and that Athina needed permanency. Although the State proved grounds for termination because Athina had been out-of-home for nearly 25 out of 26 months, it did not prove that termination was in the child's best interests. The incarcerated father was a loving and involved parent prior to incarceration and actually had placement of the child for the month preceding arrest. At the time of the termination hearing, the father was awaiting sentencing on a felony. We noted that any potential prison time was speculative and should not be a basis for terminating parental rights; although he faced a possible period of incarceration of up to 5 years, he could have been sentenced to probation or released on time served. The sentencing was to occur two weeks after the termination hearing; the DHHS testified that if the father was released, it would merit a possible reevaluation of termination.

In *In re Interest of Leland B.*, 19 Neb. App. 17, 797 N.W.2d 282 (2011), this court found that the evidence did not clearly and convincingly establish that the father neglected his son and we reversed the termination; we did not get to best interests since grounds were not proven. The State's evidence focused exclusively on the father's current incarceration, and we stated that a parent's incarceration, standing alone, does not provide grounds for termination of parental rights. The father had been a primary caregiver during the first 2½ years of the child's life. He had been incarcerated for three years at the time our opinion was released, during which time he made efforts to improve his ability to parent. We noted that he was to be released from prison in the "very near future," at which time he would be able to care for the child.

Annika and Praxton have been in an out-of-home placement since July 2014. Christopher has never met the children and his requests for visits have been denied, although there is nothing in the record to show why visits were denied. He has never had the opportunity to parent, or even to know, his children. At the time of the termination hearing, Christopher had been incarcerated at TSCI for "[a] little over three years." He was eligible for parole, but had been denied parole in July 2016 (the month before the termination hearing) because he needed to finish a violence reduction program. He was "on the list" to start that program and was "waiting to be transferred to NSP at this moment to start that class." He testified that he would go before the Parole Board again in February 2017. His "jam date" is in October 2024, but "what my Parole Board said, as soon as I

complete [the violence reduction program], I'll been [sic] released -- work released on parole." Based on Christopher's testimony, he could already be paroled by the time this opinion is released, or he could be paroled in the near future; however, he also might not be released until 2024. The exact timing of his release is speculative. The speculative nature of his release date, and the fact that he had already been denied parole once, with his next parole hearing to occur several months after the termination hearing and order, makes this case distinguishable from *In re Interest of Athina M., supra*, and *In re Interest of Leland B., supra*.

Annika and Praxton had already been in an out-of-home placement for more than two years at the time of the termination hearing, and they should not now be made to wait for some unknown amount of time, potentially many years, to achieve permanency with Christopher. See, *In re Interest of Zanaya W. et al.*, *supra* (where parent unable or unwilling to rehabilitate within reasonable time, best interests of child require termination of parental rights); *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008) (children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity). If the record had clearly shown that Christopher would undoubtedly be released from prison in the near future, we may have reached a different conclusion. But under the circumstances of this case, we find that the State has rebutted the presumption of parental fitness and that there is clear and convincing evidence that it is in the best interests of Annika and Praxton that Christopher's parental rights be terminated.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Christopher's parental rights to Annika and Praxton.

AFFIRMED.