IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MARCOS M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MARCOS M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MARCOS M., JR., APPELLANT.

Filed August 6, 2024.    No. A-23-881.

Appeal from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Affirmed.

Rhonda R. Flower, of The Law Office of Rhonda R. Flower, for appellant.

Katy A. Reichert, of Holyoke, Snyder, Longoria, Reichert, & Rice, P.C., L.L.O., guardian ad litem.

MOORE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Marcos M., Jr. (Marcos), appeals from the decision of the county court for Scotts Bluff County, sitting as a juvenile court, terminating his parental rights to his minor child, Marcos M. III (the child). We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Marcos is the father of the child, born in February 2022. The child was conceived while Marcos was briefly on parole. By the time of the child's birth, Marcos was incarcerated because

- 1 -

of a parole violation, and he remained incarcerated at the time of the parental rights termination hearing. Raquel N. is the child's mother. The parental rights termination hearing also included evidence regarding another of Raquel's children who had a different father; that father's parental rights were also terminated. Raquel's parental rights to both her children were terminated during these same juvenile proceedings. Because Raquel is not part of this appeal, she will only be discussed as necessary.

In March 2022, the child was removed from Raquel because he tested positive for methamphetamines at birth. On March 1, the State filed a petition alleging that the child was within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he was in a situation dangerous to life or limb or injurious to his health or morals in that:

> a) [Raquel's] use of substances, including during pregnancy, places the juvenile at risk of harm and/or deprives juvenile of necessary parental care and lead [sic] to the child testing positive for methamphetamines at birth[;]
>
> b) [Raquel] admitted to use of substances during pregnancy and the [j]uvenile tested positive for methamphetamine at birth[;]
>
> c) [Raquel's] use of controlled substances places the juvenile at risk of harm and/or deprives the juvenile of necessary care[.]

That same day, the juvenile court entered an order placing the child in the custody of the Nebraska Department of Health and Human Services (DHHS). The child was subsequently placed in foster care where he has remained.

On March 28, 2022, the juvenile court ordered genetic testing for "the alleged father."

The State subsequently filed an amended and second amended petition, but the allegations in parts a, b, and c as set forth above remained the same. On April 20, 2022, the child was adjudicated to be within the meaning of § 43-247(3)(a) based on Raquel's no contest "answer[]" to the allegations.

A "DNA Test Report" dated July 26, 2022, showed a "99.99996%" probability that Marcos was the child's father.

On March 1, 2023, and as amended by interlineation on May 9, the State filed a motion to terminate Marcos' parental rights to the child pursuant to Neb. Rev. Stat. § 43-292(1) and (2) (Reissue 2016). The State alleged that: Marcos had abandoned the child for at least 6 months prior to the filing of the motion; Marcos had substantially and continuously neglected or refused to give the child necessary parental care and protection; and termination of Marcos' parental rights was in the child's best interests. In an amended motion filed on June 27, the State additionally sought to terminate Marcos' parental rights to the child pursuant to § 43-292(7) because the child had been in an out-of-home placement for 15 or more months of the most recent 22 months. A second amended motion was filed in August to clarify the child's legal name.

TERMINATION HEARING

The parental rights termination hearing was held on August 10, 2023. Marcos appeared by videoconference from prison and was represented by counsel who appeared in person. We will recount the evidence relevant to Marcos. Marcos did not testify in his own behalf, nor did he call witnesses to testify on his behalf.

A certified copy of Marcos' criminal case in district court was received into evidence. In December 2015, Marcos was charged with four counts: count I, robbery, a Class II felony; count II, use of a firearm to commit a felony, a Class IC felony; count III, "Felon or Fugitive in Possession of a Firearm," a class ID felony; and count IV, possession of a controlled substance (hydrocodone), a Class IV felony. In June 2016, the State filed an amended information dismissing counts II and IV, and pursuant to a plea agreement, Marcos pled no contest to count I (robbery) and count III ("Felon or Fugitive in Possession of a Firearm"). In August 2016, Marcos was sentenced to 4 to 8 years' imprisonment on count I, and a mandatory minimum of 3 years and up to 5 years' imprisonment on count III; the sentences were to be served consecutively.

Courtney Armstrong was the child and family services specialist supervisor assigned to this juvenile case. Armstrong testified the child was born prematurely and tested positive for amphetamines at birth; the police placed the child "on a hold" that same day. A couple days later, on March 1, 2022, the child was placed in DHHS custody, and then into foster care. Marcos was subsequently determined to be the child's father. It was Armstrong's understanding that Marcos "was out on parole for a drug-related charge when he violated parole and [was] placed back in prison." Armstrong stated that Marcos was currently incarcerated.

Jim Regan, a child and family services specialist, was assigned to this case in April 2022. Regan testified that Marcos was incarcerated at the time the child was born. Marcos' "brief relationship with Raquel only took place in a time he was out on parole" and then Marcos "violated his parole and [was] sent back to prison"; "it's my understanding he wasn't out for very long" before he violated his parole and was sent back. Marcos remained incarcerated at the time of the termination hearing and had never met the child.

Regan testified that a "courtesy worker" met with Marcos for "two, possibly three visits" before Regan "discovered [he] could do a videoconference." Regan then had contact with Marcos via Zoom calls for "probably . . . four months consecutively" through the department of corrections, but it was "kind of a luck of the draw." Regan also later clarified that one of those meetings was a family team meeting. When Regan and Marcos talked, they discussed "aspects of the case, aspects of his situation, . . . things that he was doing to make himself better and more prepared to come out into the community when he's finished with his sentence." Marcos informed Regan that he was "not recommended for any substance use programming at the institution." Regan said that Marcos "expressed frustration at times about being incarcerated and not having any sort of ability to have involvement with his son." Regan could not recall if Marcos specifically took a parenting class. Regan created a case plan for Marcos but said it was difficult to implement the case plan because Marcos was incarcerated.

The case plans dated November 16, 2022, February 14, 2023, May 9, 2023, and June 21, 2023, included one safety goal for Marcos: to "build and utilize a support network once released from incarceration to show everyone that he can be a safe and sober caregiver." The case plans also state that Marcos will provide safe and appropriate parenting, and they include the following "[s]trategies": participate in and complete parenting classes and demonstrate skills learned during visits; participate in and complete substance use assessments and a mental health evaluation; learn and use coping skills to deal with stress; and establish a support network. The foregoing "are contingent on [Marcos'] release from incarceration." According to the court reports, Marcos expressed interest in the child's well-being and had been open to communicating with DHHS. The

May 9 court report also states, "[Marcos'] projected release date is 8/10/2024, according to the Nebraska Department of Correctional Services." The juvenile court's orders show that the case plans were adopted by the court and all parties were directed to comply with their terms.

Regan "attempted" to set up one video visit for Marcos and the child, but it was "denied by the department of corrections"; "the department of corrections rejected it because the foster mom was not on his visit list and neither was his son." Regan "didn't know . . . how to proceed from that point to get [Marcos] the message . . . to put them on his visitor list." Regan never informed Marcos that the names needed to be added to the visitor list. Regan said, "I was trying to work with my administration to find out what the course of action would be in terms of how that -- if I needed to maintain confidentiality of the foster mom"; "I just didn't know what the next step was." Regan never figured out how to proceed and no further attempts were made to schedule a visit. He mailed two or three pictures of the child to Marcos, and Marcos sent a birthday card for his son. Regan was asked if he thought there was an attachment between Marcos and the child. Regan answered, "I don't see how there could be," "neither of them have met each other."

When asked about what reasonable efforts DHHS made for Marcos, Regan replied, "case management," a "family strengths and needs assessment," "options counseling/education," and one family team meeting; issues setting up team meetings had to do with "department of corrections protocol." According to Regan, Marcos had been "[a]s active as he can being incarcerated," but "he's not really able to take an active role with [the child] because . . . he's incarcerated." "[D]ue to [Marcos'] choices and subsequent incarceration he's -- they -- those things have been paramount in his inability to participate in the case, so his progress is none."

Regan testified that the child had been in foster care for his entire life, 17 months at the time of the hearing, and deserved permanency. DHHS recommended terminating Marcos' parental rights because "[c]hildren should not have to wait for their parents to demonstrate that they can be safe, sober, and stable parents."

On cross-examination, Regan confirmed that he was aware that Marcos had some evaluations done as part of his incarceration, but Regan never obtained copies of those evaluations. Regan could not recall what courses Marcos had taken or participated in as part of his incarceration. Regan did not give Marcos suggestions as to what classes might be helpful; Marcos "just told me everything that he was doing, and I just affirmed with him that those were good and that, you know, he was moving in the right direction to get out and have the opportunity to be in society again." Regan never asked Marcos to provide him with any certificates he may have received from classes he took while incarcerated. Regan also confirmed that Marcos had a sister who Marcos suggested as a possible family placement for the child. However, because Marcos' sister would only take Marcos' child and not Raquel's other child, the sister was not considered. Regan acknowledged that the sister was "eliminated just on that basis alone" because "[w]ith placement we like to keep siblings together."

Regan was asked whether he completed a "family strength and needs assessment" for Marcos. Regan could not recall when he did the assessment but recalled determining goals of providing a safe and appropriate environment for the child "by ensuring [the child] is healthy and safe as evidenced by addressing and maintaining sobriety, engaging in a healthy parenting relationship, developing and utilizing [a] support network, and ensuring that resources and basic needs are met." When asked why "sobriety" was listed in Marcos' goals, Regan admitted he

"didn't have any evidence" that Marcos had a history of drug or alcohol problems. Regan also conceded that during his meetings with Marcos, he "was pretty adamant each time that he never had a history of . . . drug or alcohol abuse issues." When asked what steps Regan took to "establish and build a relationship" between Marcos and his child, Regan responded that he "attempted to have a face-to-face video visit with him, but that was denied by the department of corrections." Regan admitted that after that one effort failed, nothing was done after that to reschedule another visit. Regan also acknowledged that he did not contact Marcos about adding names to the visitor list because he was "trying to work with [his] administration to find out what the course of action would be . . . to maintain confidentiality of the foster mom" and that he "just didn't know what the next step was." Regan agreed that nothing else was done to facilitate any communication between Marcos and his child.

During cross-examination, the following colloquy took place between Marcos' counsel and Regan:

> Q [Counsel for Marcos]. Would you agree with me that the evaluation that [Marcos] had as part of his incarceration might have been helpful in terms of determining his capacity to parent this child?
> A [Regan]. Possibly.
> Q. Well, you ask for evaluations all the time, and that's because they're insightful; correct?
> A. Yes.
> Q. As you sit here today can you tell me what evidence you have that my client does not have the capacity to parent this child outside of his incarceration -- other than his incarceration?
> A. I don't.
> Q. You don't know?
> . . .
> A. Oh, . . . I said I don't.
> Q. You don't have any?
> A. Right.
> Q. So . . . the department has really done little, if anything, to evaluate whether or not [Marcos] can -- has the capacity to parent this child?
> A. Yes.

At the close of the hearing, the juvenile court terminated the parental rights of Raquel to her child with Marcos and her child with the other father. The other father's parental rights were also terminated. However, as to Marcos, the juvenile court took the matter under advisement, "with some special interest in the level of efforts that have been made on behalf of [Marcos]."

JUVENILE COURT'S DECISION

In an order filed on October 12, 2023, the juvenile court terminated Marcos' parental rights to the child after finding that statutory grounds for termination existed pursuant to § 43-292(1), (2), and (7), and that termination of parental rights was in the child's best interests. Its order stated, in part:

The facts demonstrate a complete absence by the father in the life of this child. He has never met the child, nor provided any support for the child. The child is essentially a stranger to him. Summarized, father's counsel contends that the father should be given more time if and when he gets out of prison, and that DHHS could have done more to help him while in prison. The fact remains, however, that the child was conceived while the father was out on parole, and he was back in prison by the time the child was born. The evidence shows he is scheduled to remain in prison until at least August 2024. . . . The father's voluntary conduct is what resulted in his re-incarceration, thus squandering his natural opportunity to be an involved and appropriate parent during early childhood. . . . [T]here is no evidence in this case that the father had ever provided caretaking to any minor child at any time previously, or that he was ever a fit parent prior to becoming incarcerated. He has not maintained consistent contact with the child, and guardianship was never discussed as a permanency objective in this case. The simple truth is that there is no evidence that permanency could be achieved with this father in the foreseeable future, and the child should not be made to await uncertain parental maturity. There is a complete absence of evidence that any beneficial relationship exists between the father and the minor child.

Marcos appeals.

## ASSIGNMENTS OF ERROR

Marcos assigns, restated, that the juvenile court erred in finding that (1) statutory grounds exist to terminate his parental rights under § 43-292(1) and (2), (2) termination of his parental rights was in the child's best interests, and (3) the State made reasonable efforts to reunify the family prior to termination.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Marcos' parental rights under § 43-292(1), (2), and (7). The juvenile court found that all three of those grounds existed by clear and convincing evidence. Although Marcos challenges the court's finding regarding § 43-292(1) and (2), he does not dispute that the statutory time frame for § 43-292(7) was sufficiently proven.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the

plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*. The child was removed from his mother's care in March 2022 and remained in foster care thereafter; the child never resided with Marcos, who had been incarcerated the child's entire life. By the time the amended motion to terminate Marcos' parental rights was filed on June 27, 2023, the child had been in an out-of-home placement for 15 months.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Marcos' parental rights to his son. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*.

We note that Marcos contends that the juvenile court erred in finding that the State made reasonable efforts to reunify the family prior to termination. However, reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under § 43-292(6). See *In re Interest of Mateo L. et al., supra*.

We next consider whether termination is in the child's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, the record reflects that the child was conceived when Marcos was out on parole, but by the time of the child's birth, Marcos was back in prison. Marcos remained incarcerated at the time of the termination hearing. He has not been able to actively participate in this case due to his incarceration.

Marcos has never met the child. Although we find Regan's attempts to set up video visits between Marcos and the child to be lacking, the fact remains that Marcos has never been in a position to parent the child. The only indication of a release date for Marcos appears in the DHHS

- 7 -

court report dated May 9, 2023, which states that "[Marcos'] projected release date is 8/10/2024, according to the Nebraska Department of Correctional Services." Even if Marcos is released on that date, any transition to reunification would still take time. We note that the record is silent regarding Marcos' plans upon his release as to housing and employment. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). See, also, *In re Interest of Jahon S.*, 291 Neb. 97, 105, 864 N.W.2d 228, 235 (2015) (incarceration alone cannot be sole basis for terminating parental rights, but it is factor to be considered; although incarceration itself may be involuntary, criminal conduct causing incarceration is voluntary; "[t]hus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration"); *In re Interest of Gabriella H.*, 289 Neb. 323, 855 N.W.2d 368 (2014) (incarceration does not insulate inmate from termination of parental rights if record contains clear and convincing evidence that would support termination of rights of any other parent).

In addressing how his incarceration affects the child and renders him unable to provide for the child's needs, Marcos argues that "any finding of neglect due to [his] incarceration" is nullified by the child having family members that were willing to provide for the child's care, namely the child's maternal grandfather, as well as Marcos' sister. Brief for appellant at 16. As for the child's maternal grandfather, DHHS had concerns about such a placement. Armstrong testified that the child was originally placed in foster care with the maternal grandparents; the child's half-sibling was also living in the home at the time. However, in August 2022, a search warrant was executed "by the WING Drug Task Force" at Raquel's home, and drug paraphernalia and suspected fentanyl pills were found; Raquel had both children in the home with her at the time, even though she was not allowed to have unsupervised visits with the child. Raquel admitted that she had ingested fentanyl earlier that day. The children were removed from the grandparents' home and placed in a different foster home. Regan testified that the grandparents subsequently had supervised parenting time, but the grandmother's parenting time was revoked (for reasons related to Raquel's other child). Although the maternal grandparents had separated from each other, according to a November 2022 DHHS court report, DHHS remained "worried about [the grandfather's] suitability since he was involved in [a] situation which led to the removal [of the child] from the foster home" and "DHHS also worries that [the grandfather] cannot maintain boundaries with [the maternal grandmother] or Raquel."

As for placement with Marcos' sister, Regan testified that "[w]ith placement we like to keep siblings together, and she indicated she would only take [Marcos' child]," and not Raquel's other child. Although we are not persuaded that this was a valid reason to reject consideration of placement with Marcos' sister, there is nothing in the record to indicate any challenge was made to that determination in the juvenile court.

We are also mindful that the primary issue driving the juvenile court's decision was the lack of any evidence to demonstrate that Marcos had ever provided caretaking for any minor child prior to his incarceration and that he was scheduled to remain in prison until "at least August 2024." We find *In re Interest of Gabriella H., supra*, to be instructive. In that case, the child never lived with her father, rather she lived in a foster home since she was approximately 3 days old. The father was initially involved in the child's life prior to his incarceration (i.e., attended and

participated in visits), but then demonstrated no interest in the child or in exercising parental responsibilities while incarcerated (i.e., never sent mail, money, or gifts). The Nebraska Supreme Court stated:

> We do not believe that [the child's] young age [(20 months)] excuses parental inaction. A letter or telephone call from [the father] would have at least been *something* to demonstrate love for and interest in [the child]. And there was no evidence to establish whether visitation was possible at the detention facility. Simply put, incarceration does not excuse a parent's obligation to provide the child with a continuing relationship. Here, the termination of [the father's] rights was not based on his incarceration, but, rather, on his failure to manifest any commitment to parental responsibilities.

*In re Interest of Gabriella H.*, 289 Neb. at 333, 855 N.W.2d at 376 (emphasis in original). The Supreme Court concluded that termination of the father's parental rights was in the child's best interest. Likewise, in the instant case, the child never lived with Marcos. We have previously stated that Regan's attempt to set up video visits between Marcos and the child was lacking. However, the fact remains that Marcos has never been in a position to parent the child. And according to the record, Marcos only sent the child one birthday card. Despite the child's young age, Marcos could have sent more letters or cards to the child, even if telephone calls or video visits were not allowed; this would have shown some commitment to the child and to his parental responsibilities.

The child was 17 months old at the time of the termination hearing and had been in foster care his entire life; he deserves permanency. And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Marcos was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *In re Interest of Leyton C. & Landyn C., supra.* We further find that there is clear and convincing evidence that it is in the child's best interests to terminate Marcos' parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Marcos' parental rights to his son.

AFFIRMED.