determining whether an evidentiary hearing is warranted, which are set forth above. As we have noted, Wetherell has not alleged facts sufficient to entitle her to an evidentiary hearing on her postconviction claim and the records and files show that she is entitled to no relief. Wetherell has raised no justiciable issue of law or fact, and therefore, the district court did not abuse its discretion when it did not appoint counsel.

## CONCLUSION

The relief afforded in *Miller* and resulting resentencing under § 28-105.02 apply to persons who were under the age of 18 at the time of their crimes and do not apply to Wetherell, because she was 18 years old at the time of her offense. Upon our de novo review, we determine that in her postconviction motion, Wetherell has failed to assert any facts which, if proved, constitute an infringement of her constitutional rights, and the records and files show she is entitled to no relief. Therefore, the district court did not err when it denied her postconviction motion without an evidentiary hearing and without appointing counsel.

Affirmed.

---

In re Interest of Gabriella H.,
a child under 18 years of age.
State of Nebraska, appellee, v. Ricardo R., appellant.
___ N.W.2d ___

Filed October 24, 2014.    No. S-13-900.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Parental Rights: Abandonment: Words and Phrases.** For purposes of Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2012), "abandonment" is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child.
3. **Parent and Child.** "Just cause or excuse" for a parent's failure to maintain a relationship with a minor child has generally been confined to circumstances that are, at least in part, beyond the control of the parent.

4. **Parental Rights: Abandonment: Intent: Proof.** Whether a parent has abandoned a child within the meaning of Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2012) is a question of fact and depends upon parental intent, which may be determined by circumstantial evidence.

5. **Parental Rights: Abandonment: Proof.** To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.

6. **Parental Rights: Abandonment: Time.** A parent's abandonment of his or her child for 6 months or more immediately prior to the filing of a petition to terminate parental rights is a ground for termination of such rights.

7. **____: ____: ____.** The 6-month statutory period for determining abandonment need not be considered in a vacuum.

8. **Parental Rights: Abandonment: Intent.** One may consider the evidence of a parent's conduct, either before or after the statutory period, for this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his or her child or children.

9. **Parent and Child.** Parental obligation requires a continuing interest in the child and a genuine effort to maintain communication and association with that child.

10. **Parental Rights.** Incarceration does not insulate an inmate from the termination of his or her parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent.

11. **Parental Rights: Parent and Child.** Incarceration does not excuse a parent's obligation to provide the child with a continuing relationship.

12. **Parental Rights: Parent and Child: Abandonment.** The parental obligation requires continuing interest in the child and a genuine effort to maintain communication and association with that child. Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child.

13. **Courts: Appeal and Error.** Upon reversing a decision of the Nebraska Court of Appeals, the Nebraska Supreme Court may consider, as it deems appropriate, some or all of the assignments of error the Court of Appeals did not reach.

Petition for further review from the Court of Appeals, Irwin, Riedmann, and Bishop, Judges, on appeal thereto from the County Court for Colfax County, Patrick R. McDermott, Judge. Judgment of Court of Appeals reversed, and cause remanded with direction.

Jerod L. Trouba, of Knoepfle & Trouba, P.C., L.L.O., for appellant.

Leslie J. Buhl, Deputy Colfax County Attorney, for appellee.

Jacqueline M. Tessendorf, of Tessendorf & Tessendorf, P.C., guardian ad litem.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Cassel, J.

## INTRODUCTION

The juvenile court terminated a father's parental rights based on abandonment of the child. The Nebraska Court of Appeals reversed that decision due to the father's lack of absolute certainty concerning paternity and his incarceration while awaiting trial.[1] We granted the State's petition for further review. Because the father was initially involved in the child's life but then demonstrated no interest in the child or in exercising parental responsibilities, we conclude that clear and convincing evidence supports the finding of abandonment. We reverse the decision of the Court of Appeals and remand the cause with direction.

## BACKGROUND

### Birth and Custody of Gabriella H.

In November 2011, Dorothy G. gave birth to Gabriella H. The birth certificate did not identify her father, and Ricardo R. was not present for the birth. Gabriella was immediately taken into custody by the Nebraska Department of Health and Human Services (DHHS) due to Dorothy's use of illegal drugs.

### Ricardo's Initial Involvement

Dorothy identified Ricardo as Gabriella's potential biological father, and Gabriella's caseworker approved Ricardo to be present with Dorothy during visitation with Gabriella. Dorothy referred to Ricardo as "the dad" when he attended visitation. According to visitation notes, Ricardo was present during visits on December 17, 2011, and January 12 and 13 and February 2, 2012.

---

[1] See *In re Interest of Gabriella H.*, 22 Neb. App. 70, 847 N.W.2d 103 (2014).

Some of the visitation notes discuss Ricardo's interaction with Gabriella. The January 12, 2012, visitation note stated that Ricardo attended the visit for an hour, during which time he played with Gabriella and fed her. The January 13 visitation note reflected that Ricardo was present for 45 minutes and that he held Gabriella and fed her from a bottle. The February 2 note stated in part: "A male stopped by toward the last hour of the visit whom Dorothy identified as Gabriella's father, Ricardo. . . . Ricardo said Gabriella needed a diaper change. Dorothy told him to change it, but he refused, so she did it."

## Procedural History

Shortly after Gabriella's birth, the State filed a petition to adjudicate her due to the fault or habits of Dorothy. The petition listed Gabriella's father as "[u]nknown." During a December 6, 2011, prehearing conference, Dorothy identified Ricardo as a possible father and the court ordered DHHS to determine paternity. The court subsequently adjudicated Gabriella.

DNA test results issued on November 12, 2012, established a 99.997-percent probability that Ricardo was Gabriella's biological father. On November 20, the court recognized Ricardo as Gabriella's father and appointed counsel to represent him.

On May 3, 2013, the State filed a supplemental petition to adjudicate Gabriella and to terminate Ricardo's parental rights, alleging that Ricardo had abandoned Gabriella and that termination was in Gabriella's best interests. An amended supplemental petition made no changes to the allegations against Ricardo but added allegations against Dorothy's husband, who was Gabriella's legal father. Ricardo denied the allegations of the amended supplemental petition.

## Termination Hearing

On July 30, 2013, the juvenile court held a termination hearing. Ricardo appeared, but he did not testify. Dorothy testified that when she discovered she was pregnant, she informed Ricardo he was potentially the father and he responded that "he would be there." She testified that she also informed Ricardo

there was a possibility he was not the father, but that she "was always more sure he was the father."

The caseworker testified that from the beginning of Gabriella's case until the time of genetic testing, she attempted to call Ricardo on a monthly basis, using telephone numbers provided by Dorothy. The caseworker left messages for Ricardo, but he never returned the calls. To the caseworker's knowledge, Ricardo last saw Gabriella in February 2012.

Ricardo was arrested on a criminal charge in late July 2012, and he remained incarcerated while awaiting trial throughout the pendency of this case. Upon receiving the results of genetic testing, Gabriella's caseworker sent a letter to Ricardo at the detention facility informing him that he was Gabriella's biological father and that "if he wanted to make contact with [the caseworker] he should." She testified that Ricardo did not try to communicate with her. Ricardo did not try to arrange visitation, nor did his attorney or anyone else acting on Ricardo's behalf. He never sent money, mail, or gifts for Gabriella. The caseworker testified that Ricardo never inquired about Gabriella and that Gabriella "does not know who Ricardo . . . is."

## Juvenile Court's Decision

The juvenile court entered an order terminating Ricardo's parental rights to Gabriella. The court observed that even after it appointed counsel for Ricardo, there was no evidence that Ricardo, either directly or through his attorney, made any request for visitation. The court reasoned:

> [A] parent must do something more than just enter a denial to a petition to terminate. This father knew where the child was, knew he was the father, had counsel, and knew how to reach [DHHS'] caseworkers clearly since November 20, 2012. Even being incarcerated he could have undertaken some action consistent with evidencing his intent to be a part of his child's life. He did nothing.

The court found clear and convincing evidence that Ricardo abandoned Gabriella and that termination of Ricardo's parental rights was in her best interests. Ricardo appealed.

COURT OF APPEALS' DECISION

The Court of Appeals reversed the judgment of the juvenile court. The Court of Appeals recognized that the record clearly showed that Ricardo had no contact with Gabriella during the statutory 6-month period and that there was "a complete abandonment of all parental rights and responsibilities."[2] But the Court of Appeals concluded that the evidence was insufficient as a matter of law to establish that Ricardo intentionally abandoned Gabriella, because he did not know he was her father until November 2012. The Court of Appeals further found that "even if Ricardo had known that he was Gabriella's father for the entire 6-month period, his incarceration was a circumstance out of his control which impeded his ability to parent Gabriella and, thus, precludes a finding of intentional abandonment."[3] We granted the State's petition for further review.

ASSIGNMENT OF ERROR

The State assigns, restated, that the Court of Appeals erred in reversing the juvenile court's finding of abandonment.

STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.[4]

ANALYSIS

ABANDONMENT

[2-5] The law governing abandonment is well settled. For purposes of Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2012), "abandonment" is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child.[5] "Just cause or excuse"

---

[2] *Id*. at 77, 847 N.W.2d at 109.

[3] *Id*. at 78, 847 N.W.2d at 110.

[4] *In re Interest of Justine J. & Sylissa J.*, 288 Neb. 607, 849 N.W.2d 509 (2014).

[5] *Id*.

for a parent's failure to maintain a relationship with a minor child has generally been confined to circumstances that are, at least in part, beyond the control of the parent.[6] Whether a parent has abandoned a child within the meaning of § 43-292(1) is a question of fact and depends upon parental intent, which may be determined by circumstantial evidence.[7] To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.[8]

[6-8] A parent's abandonment of his or her child for 6 months or more immediately prior to the filing of a petition to terminate parental rights is a ground for termination of such rights.[9] The relevant 6-month period in this case ran from November 3, 2012, to May 3, 2013. In the context of adoption, we have stated that the 6-month statutory period for determining abandonment need not be considered in a vacuum.[10] "'One may consider the evidence of a parent's conduct, either before or after the statutory period, for this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his [or her] child or children.'"[11] We see no reason why the same rule should not apply in a termination of parental rights case, and thus, we take into consideration Ricardo's conduct before and after the statutory period.

The Court of Appeals determined that the State failed to prove by clear and convincing evidence that Ricardo intended to abandon Gabriella. The Court of Appeals based that

---

[6] *In re Interest of Chance J.*, 279 Neb. 81, 776 N.W.2d 519 (2009).

[7] *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013).

[8] *Id.*

[9] See § 43-292(1).

[10] See *In re Adoption of David C.*, 280 Neb. 719, 790 N.W.2d 205 (2010).

[11] *Id.* at 726, 790 N.W.2d at 211.

determination on uncertainty regarding Ricardo's paternity prior to receipt of the genetic testing results and on Ricardo's pretrial incarceration. We will address these reasons in turn.

The Court of Appeals focused on when Ricardo had absolute certainty of his paternity. It reasoned that the evidence did not establish that Ricardo intended to abandon Gabriella, because the genetic testing results were not known until November 2012. But there was no evidence that Ricardo ever believed himself not to be the father. When Dorothy told Ricardo that she was pregnant, he said he would "be there." Dorothy also told Ricardo of her involvement with another man at the time Gabriella was conceived. But Ricardo attended visitations with Gabriella, holding himself out as her father. Such action is not consistent with a belief that he was not the father.

[9] The evidence demonstrates that Ricardo abandoned Gabriella after initially being involved in her life. Visitation notes reflected that he attended visitations with Gabriella on December 17, 2011, and January 12 and 13 and February 2, 2012. He played with Gabriella, held her, and fed her. But then Ricardo ceased involvement in Gabriella's life and never did anything further to demonstrate an interest in his child. Gabriella was 20 months old at the time of the termination hearing, but Ricardo last visited with her when she was less than 3 months old. He never sent money for her support, nor had he sent her a card or a gift. Parental obligation requires a continuing interest in the child and a genuine effort to maintain communication and association with that child.[12] There is no evidence that Ricardo ever called anyone to speak to or inquire about Gabriella since last seeing her on February 2. He denied the allegations of the petition seeking to terminate his parental rights but otherwise has demonstrated no interest in Gabriella. In *Kenneth C. v. Lacie H.*,[13] the father's only direct contact with a child he did not dispute was his occurred during the 2 months immediately after birth. We stated that the father's "sporadic, insubstantial efforts to establish a

---

[12] *Kenneth C. v. Lacie H., supra* note 7.

[13] *Id.*

relationship with his son, coupled with his complete failure to provide financial support, constitute clear and convincing evidence of abandonment."[14] The evidence in this case supports the same conclusion.

The lack of evidence as to any belief on Ricardo's part that he was not Gabriella's father distinguishes this case from the situations in *In re Interest of Chance J.*[15] and *In re Interest of Dylan Z.*[16]

In *In re Interest of Chance J.*, we reversed the judgment of the Court of Appeals, which found no abandonment based on the husband's lack of actual knowledge that he was the child's father. In that case, a married couple separated due in part to the wife's prostituting herself. Less than a year later, the wife gave birth to a baby with white skin, blue eyes, and red hair. Because the husband was African-American, he did not believe he was the child's father. The State later filed a petition to terminate the husband's parental rights based partly on abandonment, and genetic testing subsequently established his paternity of the child. The juvenile court terminated the husband's parental rights due in part to abandonment, but the Court of Appeals reversed. The Court of Appeals concluded that because the husband did not have actual knowledge that the child was his until genetic testing was completed, the father could not have intentionally abandoned the child. But we reversed the judgment of the Court of Appeals. We stated that "paternal uncertainty based on physical appearance of a child or suspicions of infidelity is not just cause or excuse for abandoning a child born into wedlock, especially when there are ample means to verify one's paternity."[17]

In *In re Interest of Dylan Z.*,[18] the Court of Appeals reversed a finding of abandonment based on the father's lack of knowledge that he was the child's father. In that case,

---

[14] *Id*. at 808, 839 N.W.2d at 312.

[15] *In re Interest of Chance J., supra* note 6.

[16] *In re Interest of Dylan Z.*, 13 Neb. App. 586, 697 N.W.2d 707 (2005).

[17] *In re Interest of Chance J., supra* note 6, 279 Neb. at 91, 776 N.W.2d at 527.

[18] *In re Interest of Dylan Z., supra* note 16.

Roy T. and the child's mother were no longer together when the child was born and Roy was aware that the mother was involved with another man approximately 9 or 10 months prior to the child's birth. After learning of the birth from a newspaper, Roy called a relative of the child's mother and was specifically told that he was not the child's father. When Roy was served with the supplemental petition to terminate his parental rights, he immediately contacted the DHHS worker and requested visitation. The juvenile court determined that Roy abandoned the child, but the Court of Appeals reversed. The Court of Appeals stated that Roy's lack of contact with the child was directly attributable to his lack of knowledge that he was the child's father and that his failure to connect with the child during the relevant time period was due to just cause and excuse.

In comparison to those cases, Ricardo has no justification for his abandonment. There is no evidence of any significant differences in physical characteristics between Gabriella and Ricardo. Nor is there evidence that Ricardo was ever affirmatively told by anyone that he was not Gabriella's father. And unlike the circumstances in those cases, Ricardo initially interacted with the child and held himself out as her father before disappearing from her life.

Further, the Court of Appeals minimized Ricardo's inaction once his paternity was confirmed. He knew in November 2012 that genetic testing showed him to be Gabriella's biological father. Yet, he did nothing to demonstrate an interest in Gabriella other than to deny the allegations of the supplemental petition. And even though the juvenile court appointed counsel for Ricardo in November, there has been no motion filed with the court or communication with DHHS requesting visitation or other contact with Gabriella. This inaction clearly and convincingly demonstrates an intent to be rid of parental responsibilities.

The Court of Appeals also found that Ricardo's incarceration was a circumstance out of his control and precluded a finding of intentional abandonment. The Court of Appeals cited two opinions from this court where we acknowledged

that while the fact of incarceration is involuntary, the illegal activities leading to incarceration are voluntary. But the Court of Appeals distinguished those cases because the parents there were incarcerated following a conviction, whereas Ricardo was incarcerated awaiting trial. Because Ricardo had not been found guilty of any crime, the Court of Appeals stated that Ricardo was presumed innocent. We agree with the Court of Appeals that our proposition of law regarding the voluntariness of activities leading to incarceration does not apply to a pretrial detainee.

[10,11] But incarceration does not insulate an inmate from the termination of his or her parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent.[19] We believe this proposition applies with equal force to pretrial detainees. As mentioned, Ricardo has done nothing to demonstrate an interest in his child while incarcerated. The Court of Appeals rationalized that "[a]side from visitation, it would have been very difficult, if not impossible, for Ricardo to develop a relationship with Gabriella while he was incarcerated, given that she was too young to understand or participate in cards, letters, or telephone calls."[20] We do not believe that Gabriella's young age excuses parental inaction. A letter or telephone call from Ricardo would have at least been *something* to demonstrate love for and interest in Gabriella. And there was no evidence to establish whether visitation was possible at the detention facility. Simply put, incarceration does not excuse a parent's obligation to provide the child with a continuing relationship.[21] Here, the termination of Ricardo's rights was not based on his incarceration, but, rather, on his failure to manifest any commitment to parental responsibilities. Further, Ricardo's incarceration does not explain his inaction during the nearly 6-month period

---

[19] *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992).

[20] *In re Interest of Gabriella H., supra* note 1, 22 Neb. App. at 79, 847 N.W.2d at 110.

[21] See *In re M.J.H.*, 398 S.W.3d 550 (Mo. App. 2013).

of time between his last visit with Gabriella until the time of his incarceration.

[12] The evidence clearly and convincingly supports a finding that Ricardo abandoned Gabriella. "The parental obligation 'requires continuing interest in the child and a genuine effort to maintain communication and association with that child. Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child.'"[22] Here, Ricardo voluntarily discontinued contact with Gabriella when she was not quite 3 months old. Even after Ricardo's paternity was definitively established, he did not inquire about Gabriella's welfare, attempt to arrange visitation, or take any other action to build a relationship with her. We reverse the Court of Appeals' determination on the issue of abandonment.

## Best Interests

[13] Upon reversing a decision of the Court of Appeals, we may consider, as we deem appropriate, some or all of the assignments of error the Court of Appeals did not reach.[23] Due to its erroneous conclusion that the State failed to prove a statutory ground for termination, the Court of Appeals did not address whether termination of Ricardo's parental rights was in Gabriella's best interests. We now turn to that issue.

The evidence clearly and convincingly established that termination of Ricardo's parental rights was in Gabriella's best interests. Gabriella had never lived with Ricardo; rather, she continuously lived in a foster home since she was approximately 3 days old. Gabriella, who was 20 months old at the time of the termination hearing, last saw Ricardo when she was less than 3 months old. He has not been involved in her life since that time. The caseworker testified that she did not feel permanency could be achieved with Ricardo, because Gabriella "does not know who [he] is." The caseworker testified that Ricardo was in a detention facility "for an undetermined

---

[22] *In re Adoption of David C.*, *supra* note 10, 280 Neb. at 726, 790 N.W.2d at 211.

[23] *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009).

amount of time," that Gabriella deserved permanency sooner rather than later, and that Gabriella "needs to get out of the foster care system." We conclude the juvenile court did not err in finding that termination of Ricardo's parental rights was in Gabriella's best interests.

## CONCLUSION

Upon our de novo review, we conclude that the State proved by clear and convincing evidence that Ricardo abandoned Gabriella and that termination of his parental rights was in Gabriella's best interests. We reverse the decision of the Court of Appeals, and we remand the cause to the Court of Appeals with direction to affirm the judgment of the juvenile court.

REVERSED AND REMANDED WITH DIRECTION.

STATE OF NEBRASKA, APPELLEE, V.
RICKY J. SANDERS, APPELLANT.
___ N.W.2d ___

Filed October 24, 2014.    No. S-13-901.

1. **Postconviction: Constitutional Law: Appeal and Error.** In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.

2. **Postconviction: Constitutional Law: Proof.** The Nebraska Postconviction Act, Neb. Rev. Stat. § 29-3001 et seq. (Reissue 2008 & Cum. Supp. 2012), provides that postconviction relief is available to a prisoner in custody under sentence who seeks to be released on the ground that there was a denial or infringement of his constitutional rights such that the judgment was void or voidable. Thus, in a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable.

3. ____: ____: ____. A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the Nebraska or federal Constitution. If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the