IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF R.T. & A.T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF R.T. AND A.T., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ROBERT T., APPELLANT, AND KRISTINA S., APPELLEE.

Filed October 1, 2024.    Nos. A-23-806, A-23-808.

Appeals from the County Court for Kimball County: RANDIN R. ROLAND, Judge. Affirmed.

Rhonda R. Flower, of the Law Office of Rhonda R. Flower, for appellant.

Sterling T. Huff for appellee Kristina S.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Robert T. appeals the orders of the county court for Kimball County, sitting as a juvenile court, which terminated his parental rights to his two children, R.T. and A.T. For the reasons that follow, we affirm.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

Kristina S. and Robert were married in 2008. They initially lived together in Wyoming but moved to Texas for a period to be closer to Robert's family. In 2010, they had their first child together, R.T. After several months, Kristina moved back to Wyoming while Robert was on an

extended assignment with the military in California. After 5 or 6 months, Robert moved to Wyoming as well. In 2012, they had their second child, A.T.

In August 2014, Kristina received a message on Facebook from another woman, Kristina Maes, who asked her if Robert was married. Maes informed Kristina that she lived in California and had been in a relationship with Robert while he was there. Kristina confronted Robert with this information and informed him that she wanted a divorce. This began a weeklong series of conflict where Robert begged for Kristina to reconsider the divorce, hid her car keys, followed her when she left the house, threw her into a wall, smashed her phone with a hammer, and threatened to kill himself. Robert also disabled the Wi-Fi and did not let Kristina use her phone once she replaced the phone he broke. This conflict escalated on August 15, when Robert restrained Kristina with handcuffs while attempting to convince her not to divorce him. He first handcuffed her hands behind her back before letting her go. But after she remained adamant that she wanted a divorce, he handcuffed her left arm to her right ankle. A.T. was present throughout this incident and was reportedly upset and crying.

Toward the end of this week, Robert convinced Kristina to accompany him to a counseling session. After speaking with Kristina, the counselor noticed the bruises on her ankle from the handcuffs and indicated she was afraid for Kristina's safety. Police were called to the office and Robert was arrested. Shortly afterward, Kristina filed for divorce and a protection order. The protection order was granted, and Robert was initially denied any visitation with R.T. and A.T. This changed in November 2014, when he was granted supervised visitation.

After his arrest, Robert was charged with false imprisonment, domestic assault, and domestic battery. He eventually pled to a misdemeanor charge of unlawful contact by touch. As a result of this conviction, he was sentenced to 1 year of unsupervised probation.

Around May 2015, while Kristina and Robert were separated pending their divorce, Robert was in a relationship with Maes. Around this time, Robert was charged with violating his probation for possessing firearms and knives. Additionally, he was charged with the domestic assault and stalking of Maes. He eventually entered into a plea agreement where he pled to impedance of an officer and was sentenced to another year of unsupervised probation. Due to these new charges, his supervised visitation with R.T. and A.T. was suspended on June 16, 2015. This suspension eventually ended on October 2, and his supervised visits resumed. In November 2016, Kristina and Robert's divorce was finalized.

In January 2017, Robert was arrested for DUI while R.T. and A.T. were in the vehicle. He eventually entered into a plea agreement where he pled to reckless driving and received an additional period of unsupervised probation. Around this time from 2017 to 2018, Robert was in a relationship with another woman, Jennifer LaPratt, who he now shares two children with. These children were respectively born toward the end of 2018 and sometime in 2020. Robert has since had his rights terminated for the oldest child and disputes his parentage of the younger one. He essentially denies that he is the younger child's father because it has never been proven by a genetic test. Robert has never provided any financial support for these children and has never met the younger child. Although Robert and LaPratt's relationship ended sometime in 2018, they still interacted afterward to raise their children.

On January 18, 2019, there was an incident between Robert and LaPratt. On that date, LaPratt was watching her and Robert's first child, while pregnant with the second one, when he

arrived at her house with R.T. and A.T. Upon his arrival, he rammed his truck into her car pushing it up onto the porch stairs. After he banged on the front door, LaPratt let him inside and R.T. and A.T. went to the living room to watch TV. Robert got upset with LaPratt for locking the door and moving his rifle. He grew increasingly angry, started throwing things, and dragged R.T. back to the bedroom. At this point R.T. and A.T. were both crying and LaPratt became very fearful. She ran outside with her 2-month-old child in her arms, but Robert caught her, grabbed her, and threw her to the ground. He held her down, took the child from her arms, and proceeded to choke her by putting his knee on her neck and his leg on her chest until she passed out.

When LaPratt regained consciousness, she fled to her vehicle while Robert was yelling at her to get inside. After yelling at her through the car window, Robert got into his vehicle and rammed into the rear of LaPratt's two times. At this point, R.T. and A.T. ran outside of the house both crying and screaming. LaPratt started her vehicle and attempted to flee, but Robert was able to stop her by pinning her vehicle. He then got out of his vehicle and hit her window with his hands, arms, and head in attempts to break it. LaPratt was eventually able to unpin her vehicle and drive to a nearby bar where she asked someone to call the police. Law enforcement soon arrived, took her statement, and followed her back to the house.

Robert was arrested and charged with strangulation of a household member, domestic assault, child endangerment, and reckless endangerment. Following this arrest, on February 8, 2019, Robert's supervised visitation for R.T. and A.T. was once again stayed. This stay has never been lifted. Additionally, this event prompted the proceedings which terminated Robert's parental rights to his and LaPratt's first child. In July 2021, Robert entered into a plea agreement where he pled to reckless endangerment, child endangerment, and unlawful touching. He was sentenced to 180 days in jail and 3 years of probation.

Following Robert's release from jail, he met his current fiance, Katina Miller, and moved into her home in South Dakota. By all accounts, he has not had any contact with R.T. or A.T. since January 18, 2019, and other than a handful of child support payments, has failed to pay Kristina the court ordered child support. He now owes Kristina around $28,000 in child support.

In July 2020, Kristina moved to Kimball, Nebraska, with R.T. and A.T. However, Robert did not learn of this move until January 2022. In July 2022, Robert had the Wyoming divorce decree registered as a foreign judgment in the district court for Kimball County. In response, on September 14, Kristina filed a motion to terminate Robert's parental rights. This motion alleged that Robert's parental rights to R.T. and A.T. should be terminated pursuant to Neb. Rev. Stat. § 43-292(1), (2), (3), (4), and (5) (Reissue 2016) and that termination of his rights was in the children's best interests.

On October 5, 2022, Robert filed a complaint to modify custody in which he requested that he be awarded sole legal and physical custody of R.T. and A.T. On November 4, the case was transferred to the county court for Kimball County.

## 2. TERMINATION HEARING

A termination hearing was held in September 2023. Kristina called LaPratt, Helen Winston, herself, James Segreaves, and Robert as witnesses. Robert called Steven Elmshaeuser, Dr. Tom Kirk, Chuck Skinner, Zachary Martin, Lewis Bolton, Helen Scott, Joanne Zook, Miller, and himself as witnesses.

LaPratt testified that she met Robert in 2017 and described their relationship as "[s]cary." She indicated that throughout their relationship he was violent and stalked her. She discussed her feelings that she could not exit the relationship and described a situation where she got an apartment to get away from him, but police had to get involved after he found her and broke her door down. Although she was never certain, she believed that he placed a tracker on her vehicle because he would consistently show up at the same places as her.

LaPratt then discussed the incident from January 18, 2019. She explained that throughout the event, Robert was "totally different" and described his eyes as "pitch black." She testified about the fear she had throughout the ordeal and the effects it had on R.T. and A.T. as they watched it unfold. She stated that she had "total fear" for their safety because they were standing on the porch as Robert rammed his vehicle into hers and were within inches of being hit. Throughout her narrative she stated that R.T. and A.T. were both crying and screaming because they did not understand what was happening.

LaPratt then discussed another incident where she received a message from a woman asking if Robert was in a relationship. This woman indicated that she was seeing Robert and sent LaPratt screenshots of their text conversations. LaPratt stated that when she went to Robert's house to confront him with this information, R.T. and A.T. were in the living room. LaPratt testified that after she showed him the messages, Robert took the phone out of her hands, threw it on the ground, and stomped on it. She then described how Robert's mother pushed her down the stairs and physically forced her out of the house in front of R.T. and A.T. LaPratt testified that R.T. and A.T. were crying during this incident because they did not understand why their grandmother and father were fighting with her.

LaPratt next described another volatile situation when she arrived at Robert's house while R.T. and A.T. were present. She explained that when she arrived, she found the children unsupervised. She testified that when she got there A.T. answered the door and no one was on the same floor as the children. Then after looking around the house, she found Robert with another woman in the downstairs bathroom. This was particularly troublesome because she still believed that she and Robert were in a relationship. This led to a confrontation where his mother eventually chased her out of the house.

LaPratt then discussed an incident that occurred after she and Robert broke up. On this occasion, LaPratt was watching R.T., A.T., and her and Robert's first child when he showed up. She explained that Robert became angry when he realized that her new boyfriend was there and was holding their child. After Robert's emotional response prompted her boyfriend to leave, she described how he began to criticize the dress she was wearing because he thought it was too revealing. She testified that after berating her, he ripped the dress off her, burned it on the stove, and threw it in the trashcan. LaPratt stated that R.T., A.T., and her other child saw him rip the dress off her and started crying when it happened. She then described that while she was still naked and the children were screaming and crying, Robert locked her in the bedroom.

LaPratt then testified more broadly about Robert's relationship with R.T. and A.T. She stated that while he still had supervised visitation, he would have them every other weekend. She generally described how he did not take responsibility for them and would just drop them off at her house once his visitation time began. And when he was present, she stated that he usually just played video games by himself.

The next witness was Winston, R.T. and A.T.'s guardian ad litem. As part of preparing her report, Winston conducted interviews with Robert and reviewed a psychological exam he took in August 2021. She testified that throughout her interview with Robert, she determined that he was not being truthful. She explained how Robert claimed LaPratt made up the incident when he strangled her, claimed to only have four children when he has five, and over exaggerated his prior involvement in the children's lives. She then explained the results of his psychological exam which found that he had posttraumatic stress disorder ("PTSD"), and a traumatic brain injury ("TBI") related to his military service. The exam also found that Robert has problems with executive functions, specifically with his memory, and hypothesized that he has more problems associated with his diagnoses than he was willing to report.

Winston then summarized her belief that it was in R.T. and A.T.'s best interests for Robert's parental rights to be terminated. She explained that because they had not seen him in 4½ years, they did not remember much about him, and essentially considered him a stranger. Winston stated that both children were ambivalent toward Robert and did not care about reestablishing contact. She testified that A.T. was especially hesitant about reconnecting with him and had questions about why it took so long for him to reach out. Additionally, Winston believed rekindling relationships with Robert would be upsetting for both children because the memories they had of Robert were not particularly positive. Specifically, she mentioned that the children remember the 2019 incident with LaPratt and associate Robert with negative memories and violence.

Kristina then testified. She first discussed her and Robert's tumultuous relationship, how Maes contacted her, and the handcuffing incident that led to Robert's criminal charges in 2014. She then explained her move to Nebraska, how Robert was not involved in R.T. and A.T.'s lives since 2019, and how he did not pay her child support. She stated that when she lived in Wyoming, he never voluntarily paid child support, but she was able to get a few payments by garnishing his wages. She next stated that since moving to Nebraska in 2020, she has only received two child support payments from him. In total, she believed that she has only received five to seven child support payments from Robert since 2019. Copies of Robert's child support obligations were then received into evidence which showed that he owed $26,062.87 in child support in Wyoming and $2,179.41 for child support in Nebraska.

Kristina then testified about her current homelife and new husband, Segreaves. She stated that she met Segreaves 6 years ago and has two children with him. She said that R.T. and A.T. call him "dad" and have very good relationships with him. She then explained that she did not believe that it was in her children's best interests to reestablish relationships with Robert. She stated it would be "extremely mentally challenging for the kids to establish contact after four and a half years of his absence." She discussed how R.T. did not want visitation with Robert because he remembers the violence associated with him and how A.T. was confused as to why Robert wanted to spend time with them now after so many years.

Segreaves then testified. He stated that for the past 3½ years, R.T. and A.T. have called him "dad" and consider him to be their father. He explained that he has two other children that he visits often in Pennsylvania and that he has a 2008 criminal conviction for burglary in Pennsylvania. He accepted responsibility for that conviction and stated that he never tried to hide it throughout the proceedings.

Robert then testified and was asked about his children, employment history, and past criminal convictions. He indicated that he has had no contact with R.T. or A.T. since his arrest in January 2019, has not attempted to see them, and has generally been removed from their lives ever since. He explained that the attorney representing him in his divorce and criminal proceedings had advised him to resolve his criminal matters before attempting to secure visitation with them. Additionally, he claimed that he did not attempt to reach out to R.T. and A.T. because he did not know where they were. Because Kristina never gave him notice of her move to Nebraska, he did not learn that his children were in a different state until February 2022. He indicated that once he knew where R.T. and A.T. were, he attempted to contact them by calling their school, but the school did not want to get involved due to the active stay on visitation.

In talking about his other children, Robert denied that his rights to LaPratt's first child were terminated and stated that he would claim LaPratt's second child if he was proven to be the father through genetic testing.

Robert also discussed his employment history and the $28,242.28 he owes in child support. He discussed how he was currently self-employed as a semi-truck driver. He stated that he was unemployed from 2021 to 2023 but received around $2,000 a month in disability benefits from the U.S. Department of Veterans Affairs for his PTSD and TBI diagnoses. He did not give a reason for why he failed to pay child support over this period but indicated he had been unable to find a job to accommodate his treatment schedule. He stated that he has been seeing a counselor at the VA since 2020 and participated in an 18-week prolonged exposure therapy program to help with his PTSD. Robert testified that although his disabilities affect his speech and communication and cause him depression and anxiety, he was still capable of full-time employment.

Elmshaeuser testified next. He was appointed as Robert's guardian ad litem in November 2022 due to concerns regarding his mental health. He essentially concluded that Robert's mental illnesses did not affect his parental duties or his capacity to work.

The next witness was Kirk, a licensed therapist who conducted a Wyoming court ordered domestic violence assessment and evaluation on Robert in October 2020. He explained his report which articulated that although Robert had a lack of insight into some of his own behaviors, he did not have any impulsivity or anger issues. With these findings, Kirk concluded that Robert was at a "minimal risk of recidivism" and recommended the lowest level of treatment.

However, on cross-examination, Kirk was asked about the nature of Robert's criminal convictions. He indicated he was unaware of the 2014 handcuff situation involving Kristina, that A.T. was present during that event, and that Robert threatened to commit suicide after Kristina told him she wanted a divorce. Likewise, he was unaware of the 2015 stalking and domestic assault incidents involving Maes, the 2017 DUI charges where the children were in the backseat, and the incident where Robert knocked down LaPratt's door. Kirk expressed that if he had known about these various incidents when conducting the assessment, the results would have been different, and he would have recommended a more intensive treatment program.

Skinner testified next and is a psychotherapist who works with a program called "Dads Making a Difference." This is a 12-week program that seeks to assist fathers by providing them with job training and applicable life skills. Robert participated in this program beginning in June 2018 and was selected to be the class's salutatorian. Skinner said that Robert was always honest and never demonstrated he had anger issues. Skinner then explained that Robert had reached out

after the January 2019 incident with LaPratt but indicated that he was unaware of several of Robert's other criminal convictions.

Martin then testified. Martin operates a program called "Kids Deserve Dads" which helps fathers build and maintain relationships with their children. Robert participated in this program in the fall of 2018. Martin said that he thought Robert was a good dad and that he always talked about his kids.

Bolton testified next. He worked with Robert in 2016 and became friends with him outside of work. He essentially said that Robert's kids loved him, and he loved his kids, but also explained that he had not seen Robert in approximately 5 years so his perception of him was primarily based on interactions from 2016 or 2017.

The next witness was Scott. She dated Robert for approximately 6 months beginning in 2018 and ending sometime in 2019. She stated that she never observed Robert being violent or abusive. However, she acknowledged that she had never met any of his children and did not know about Robert's criminal charges from 2014 involving Kristina, his charges from 2015 involving Maes, or about his 2017 DUI charges. And although she was dating Robert when the 2019 incident with LaPratt occurred, Scott expressed that she was told a different story about what happened.

Zook, the attorney that represented Robert in his divorce and two of his Wyoming criminal matters also testified. She said that Robert always asked about R.T. and A.T. and was very interested in seeing them. But she explained that she advised Robert it was better to get past the criminal proceedings before attempting to get visitation with his children. She discussed how Robert posted a significant bond and that one of the conditions of that bond was to not communicate with Kristina or their children. Accordingly, she testified to her concern that if Robert attempted to contact the children, his bond could be revoked, and he could be exposed to further criminal charges for violating the stay on his visitation. She expressed that Robert did not like this advice but abided by it. She also stated that they never received any notice that Kristina was moving the children out of state.

Miller, Robert's fiance, then testified. Miller met Robert in August 2019, and they moved in together several months later. This involved Robert moving to South Dakota. She generally expressed that she has never experienced any violence, abuse, or problems from Robert. She testified that he is kind, caring, selfless, and treats her and her teenage daughter very well. She explained that Robert misses his children a lot and wants to see them.

After the hearing concluded, the court took the matter under advisement.

### 3. TRIAL COURT'S ORDER

On September 23, 2023, the county court issued its orders terminating Robert's parental rights to R.T. and A.T. The orders found that Kristina failed to prove § 43-292(4) and (5) by clear and convincing evidence, but proved § 43-292(1), (2), and (3). The court further found that terminating Robert's parental rights was in R.T. and A.T.'s best interests.

Robert now appeals the decisions that terminated his parental rights. We have consolidated the two appeals for purposes of our review.

## III. ASSIGNMENTS OF ERROR

Restated, Robert assigns the court erred by finding that Kristina met one of the statutory grounds enumerated in § 43-292 and that terminating his parental rights was in the best interests of R.T. and A.T.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

## V. ANALYSIS

Under Nebraska law, terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and clear and convincing evidence that termination is in the best interests of the children. *In re Interest of Jay'Oni W. et al.*, 31 Neb. App. 302, 979 N.W.2d 290 (2022). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existences of a fact to be proven. *Id.*

### 1. STATUTORY BASES

Robert assigns that the juvenile court erred by finding that there was sufficient evidence to prove the grounds set forth in § 43-292(1), (2), and (3). To satisfy these grounds, Kristina had to respectively prove by clear and convincing evidence that Robert (1) abandoned the minor children for 6 months or more prior to her filing the petition; (2) substantially and continuously or repeatedly neglected and refused to give the minor children necessary parental care and protection; and (3) being financially able, neglected to provide the minor children with the necessary subsistence, education, or other care when legal custody of the minor children was lodged with her and such payment was ordered by the court. § 43-292(1) through (3).

We note that although only one of these statutory bases needs to be met, given the facts of this case, our analysis covers all three bases found by the county court. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

### (a) § 43-292(1)

Robert first argues that the court erred in finding that he abandoned R.T. and A.T. for 6 months or more immediately prior to the filing of the petition. To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities. *In re Interest of Gabriella H.*, 289 Neb. 323, 855 N.W.2d 368 (2014).

Whether a parent has abandoned a child within the meaning of § 43-292(1) is a question of fact and depends upon parental intent, which may be determined by circumstantial evidence. *In re Interest of Gabriella H., supra.* The 6-month statutory period for determining abandonment need not be considered in a vacuum in a termination of parental rights action; one may consider

the evidence of a parent's conduct, either before or after the statutory period, for this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his or her child or children. See *id.*

In his argument, Robert contends that he went 4½ years without contacting R.T. and A.T. because a condition of his bond prohibited such contact. Accordingly, he asserts that if he had attempted to communicate with his children, he faced the revocation of his bond and possible further criminal consequences. Because of these potential consequences, he states that he followed the advice of his attorney to wrap up his criminal matters before attempting to reestablish contact. Additionally, he argues that he was unable to maintain contact with his children because he did not know where they lived and, unbeknownst to him, had moved to Nebraska in 2020.

For the purposes of § 43-292(1), "abandonment" is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child. *In re Interest of Gabriella H., supra.* Just cause or excuse for a parent's failure to maintain a relationship with a minor child has generally been confined to circumstances that are, at least in part, beyond the control of the parent. *Id.* Robert essentially argues that the bond condition which prohibited him from contacting his children constituted "just cause." We disagree.

While not perfectly analogous, the Nebraska Supreme Court has held that in cases involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). It reasoned that although the parent's incarceration itself may be involuntary, the criminal conduct causing the incarceration was voluntary. See *id.* We believe the same logic applies to a bond condition that prohibits a parent from communicating with their children. Robert's bond condition that barred him from contacting R.T. and A.T. was the result of his criminal actions and subsequent convictions. Because those actions were voluntary, we do not believe that the salient bond condition constitutes just cause. Therefore, the bond condition does not prohibit us from considering Robert's prolonged failure to fulfill his parental obligations to R.T. and A.T.

Although a condition of Robert's bond prohibited him from contacting his children, we determine that the evidence clearly and convincingly supports the finding that Robert abandoned R.T. and A.T. for 6 months or more prior to the filing of the petition. Robert has gone 4½ years since seeing or communicating with his children. Over that period, he has only made two voluntary child support payments, and the arrearage now amounts to more than $28,000. He has shown no interest in his children's education, well-being, or in maintaining any sort of relationship with them. He has taken no responsibility for their emotional, mental, financial, or physical care. As a result of his complete lack of any presence in their lives, both children barely remember who he is and now consider him to be a stranger. Illustrative of Robert's lack of effort in fulfilling his parental obligations is that he did not even know where the children resided for nearly 2 years. While he asserts his lack of knowledge was due to Kristina failing to notify him of their move, Robert could have taken a variety of actions to discover their location. Because Robert has failed to provide R.T. and A.T. with any meaningful support over the last 4½ years, we determine there was sufficient evidence that Robert clearly and convincingly acted in a manner that displayed a settled purpose to be rid of all parental obligations toward these two children. Therefore, the county court did not

err in finding that Robert abandoned R.T. and A.T. for 6 months or more prior to the filing of the petition.

### (b) § 43-292(2)

Robert next argues the court erred in finding that he substantially and continuously or repeatedly neglected and refused to give R.T. and A.T. the necessary parental care and protection. For the purposes of § 43-292(2), one does not need to have possession of the child to demonstrate the existence of neglect. See *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under this section. *Id.*

For similar reasons that we concluded Robert abandoned R.T. and A.T., we also determine that he substantially and continuously or repeatedly neglected and refused to provide them with the necessary parental care and protection. Other than a handful of child support payments, Robert has completely failed to provide for his children over the last 4½ years. He now owes more than $28,000 in child support and does not have a relationship with either child. Because Robert has been absent from R.T. and A.T.'s lives since 2019 and has failed to maintain any relationship with them, he has been fully unable to provide them with any sort of meaningful support or care. Therefore, we conclude that the county court did not err in finding that Robert substantially and continuously or repeatedly neglected and refused to give R.T. and A.T. the necessary parental care and protection.

### (c) § 43-292(3)

Robert next argues the court erred in finding that, while financially able, he willfully neglected to provide necessary subsistence, education, or other care necessary for R.T. and A.T.'s health, morals, or welfare or neglected to pay for such subsistence, education, or other care when Kristina had legal custody, and he was ordered by the court to pay child support.

We determine the county court did not err in finding that Robert met the conditions for § 43-292(3). We first determine that there was sufficient evidence for the county court to find that he was financially able to provide for his children. Although he was unemployed between 2021 and 2023, Robert had several different jobs prior to that period. Additionally, he received disability income from the VA and now operates his own trucking company. Despite these various sources of income over the last 4½ years, Robert has failed to pay the required child support and has not provided R.T. and A.T. with any of the necessary supplies for their general care. In particular, he has never provided them with any food, clothes, shoes, or health insurance. Accordingly, other than Robert's minimal child support payments, Kristina and her husband have borne the full financial responsibility for raising R.T. and A.T. For these reasons, we determine the county court did not err in finding that Robert, being financially able, willfully neglected to provide necessary subsistence, education, or other care necessary for R.T. and A.T.'s health, morals, or welfare or neglected to pay for such subsistence, education, or other care.

### 2. BEST INTERESTS AND UNFITNESS

We next consider whether the county court erred in determining that it was in R.T. and A.T.'s best interests to terminate Robert's parental rights. A child's best interests are presumed to

be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the opposing party has proved that the parent is unfit. See *id*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

In determining whether a parent is unfit, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.*

We determine the court did not err in finding that terminating Robert's parental rights was in the best interests of R.T. and A.T. Although Robert has demonstrated significant effort in improving his life, his history of domestic violence, prolonged absence from R.T. and A.T.'s lives, and failure to establish any sort of beneficial relationship with them favors the termination of his parental rights.

Robert has a significant history of committing domestic violence and engaging in actions that endangered R.T. and A.T. In 2014, he restrained Kristina in handcuffs while A.T. watched crying; in 2015, he stalked and assaulted Maes; in 2018, he broke down LaPratt's apartment door; sometime around 2018 or 2019, he ripped LaPratt's dress off of her and burned it on the stove while R.T. and A.T. were present and crying; in 2017, Robert was arrested for DUI while R.T. and A.T. were in the backseat; and in 2019, he assaulted LaPratt and rammed his vehicle into hers. Notably, R.T. and A.T. watched these events unfold and were inches away from being hit by LaPratt's vehicle as Robert rammed into it. While these incidents took place some time ago, their number, nature, and frequency pose obvious concerns.

More so, the timing of the 2019 incident with LaPratt is particularly worrisome as it came after Robert began demonstrating improvements throughout 2018. While participating in Dads Making a Difference, he earned the respect of his colleagues and was selected to speak as the salutatorian in the October graduation ceremony. And through his involvement with Kids Deserve Dads, Robert formed a relationship with Martin and volunteered to help the organization. However, despite these commendable steps to improve his life, months after his graduation from Dads Making a Difference and involvement in Kids Need Dads, Robert chased, assaulted, and strangled LaPratt in front of R.T. and A.T.

Since that incident, Robert has continued to take steps toward personal improvement, such as participating in counseling and enrolling in an 18-week prolonged exposure therapy program to help his PTSD. But while Robert seems to have significantly improved and now has a positive relationship with his fiance and her daughter, he has not put any effort into maintaining relationships with R.T. and A.T.

The last time Robert had any contact with R.T. and A.T., they were approximately 8 and 7 years old. At the time of the hearing, they were 12 and 11 years old. Due to Robert's extended absence, both children are ambivalent toward him and are hesitant to rekindle a relationship with someone they perceive to be a stranger and that they associate with violence. R.T. and A.T. now

consider Kristina's husband, Segreaves, to be their dad and have not expressed great interest in reconnecting with Robert.

Robert attempts to justify his lengthy absence from R.T. and A.T.'s lives by arguing that he was following the advice of his attorney to not contact R.T. and A.T. while his criminal proceedings were pending, a bond condition prohibited such contact, and the stay of visitation was still in place. However, we observe that there is nothing in the record to support that the bond condition was still in effect once he was sentenced, as bond conditions are typically lifted at the conclusion of a criminal proceeding. Likewise, there is nothing in the record to support that he was prohibited from seeking the dissolution of the stay of visitation at any point, but he failed to do so until the current proceeding. While delaying that filing may have been strategic by his attorney, it does not justify Robert having zero contact with his children for such a prolonged period of time. Therefore, we do not find Robert's arguments persuasive.

Robert has been absent from R.T. and A.T.'s lives for 4½ years. And prior to his absence, he exposed both of them to numerous acts of violence that left lasting impacts. Since those incidents, he has failed to provide them with any emotional, educational, or parental care. More so, he has provided minimal financial assistance and has never gone out of his way to provide them with any food, clothes, school supplies, or any other materials they require. As such, he has completely failed to establish any sort of beneficial relationship between himself and his children. With these facts, we determine that Robert's history of domestic violence and complete failure to maintain any relationship with R.T. and A.T. display personal deficiencies which have prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. Therefore, we conclude that the county court did not err in finding that terminating Robert's parental rights to R.T. and A.T. was in their best interests.

## VI. CONCLUSION

We conclude that the county court did not err in terminating Robert's parental rights to R.T. and A.T.

AFFIRMED.